BEA, Circuit Judge,
dissenting.
I dissent because I think a genuine issue of material fact exists as to whether the probability that Plaintiffs will see a cougar will decrease. On this record, that may depend on whether the Oregon Department of Fish and Wildlife (“ODFW”) can kill cougars as effectively and quickly without the assistance of Wildlife Services.
A plaintiff bears the burden of establishing the three elements of Article III standing: “(1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision.” Salmon Spawning & Recovery Alliance v. Gutierrez, 545 F.3d 1220, 1225 (9th Cir.2008). A plaintiffs burden with respect to establishing these elements increases at each stage of litigation. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In response to a motion for summary judgment, a plaintiff must “ ‘set forth’ by affidavit or other evidence ‘specific facts,’ which for purposes of the summary judgment motion will be taken to be true.” Id. (internal citation omitted).
Here, the district court held Plaintiffs lacked standing at the summary judgment stage. Thus, the question we are asked to decide is whether Plaintiffs adduced evidence from which a rational trier of fact could have found facts sufficient to satisfy the elements of Article III standing. See Blankenhorn v. City of Orange, 485 F.3d 463, 470 (9th Cir.2007) (summary judgment must be denied if a rational trier of fact might resolve the issue in favor of the nonmoving party).
The relevant injury in this case is the reduced likelihood that Plaintiffs will see a cougar in Oregon. Based on this injury, the relevant inquiry for pui-poses of re-dressability is whether a judgment in favor of Plaintiffs could increase the likelihood that they will eventually see a cougar in Oregon.
First, a judgment in favor of Plaintiffs could affect Wildlife Serviees’s participation, one way or another, in the killing of cougars in Oregon. “A plaintiff ... who asserts inadequacy of a government agency’s environmental studies under NEPA need not show that further analysis by the government would result in a different conclusion. It suffices that ... the [agency’s] decision could be influenced by the environmental considerations that NEPA requires an agency to study.” Hall v. Norton, 266 F.3d 969, 977 (9th Cir.2001) (internal citation omitted) (emphasis added). Here, Plaintiffs were not required to show that further analysis under NEPA would cause Wildlife Services to terminate its agreement with ODFW. Rather, it is sufficient that further analysis under NEPA could cause Wildlife Services to terminate its agreement with ODFW.
Second, although there is no evidence in the record that the total number of cougars that will eventually be killed in Oregon will decrease if Wildlife Services terminates its agreement with ODFW, there is evidence in the record sufficient to create a triable issue of fact as to whether the rate at which cougars will be killed will decrease if Wildlife Services stops killing *665 cougars in Oregon. In the Cougar Management Plan, ODFW set a goal to kill a total of sixty-six cougars per year in three target areas. Without the assistance of Wildlife Services, ODFW killed only twenty-six cougars during the 2006-2007 winter, with five people working part-time. The following winter, ODFW killed twenty-three cougars with five people working part-time while Wildlife Services killed sixteen cougars with two people working part-time. The total cost of killing the cougars was nearly the same each year: $113,165 and $115,827, respectively. Yet, the number of cougars killed increased by 50% once Wildlife Services started killing cougars. Based on this evidence, a rational trier of fact could reach the same conclusion that the magistrate judge reached: “Clearly Wildlife Services is more efficient at killing cougars than ODFW.”
It may well be that Oregon will be able to kill cougars just as fast as Wildlife Services did. But the facts in the record do not show such a determination can be made as a matter of law. It may be that if Wildlife Services is enjoined, the rate at which cougars will be killed will decrease to the winter 2006-2007 level that preceded Wildlife Services’s participation in the cougar-killing program. Or it may be that ODFW can enlist volunteers to hunt cougars with dogs as permitted by Oregon Revised Statute section 498.164(3) or increase its cougar-kill budget enough to replace the results brought about by Wildlife Services. But we cannot predict that with the certainty required for factual determinations in summary judgment proceedings.
If a trier of fact were to conclude that cougars will be killed at a slower rate without the participation of Wildlife Services, Plaintiffs can satisfy the elements of Article III standing. Plaintiffs’ injury— the decreased likelihood of seeing a cougar — is fairly traceable to Wildlife Services’s agreement to kill cougars and Wildlife Services’s ability to kill cougars more quickly and more efficiently than does ODFW. Further, Plaintiffs’ injury can be redressed, at least in part, by an order of the district court to enjoin Wildlife Services’s killing of cougars until it complies with NEPA. Therefore, I would reverse the district court’s order and remand for adjudication on the merits.